116 N.J. Super. 148 (1971)
281 A.2d 377
ROBERT D. SPIEGLE AND DORIS LORRAINE SPIEGLE, HIS WIFE, PLAINTIFFS-APPELLANTS,
v.
BOROUGH OF BEACH HAVEN AND AMERICAN TELEPHONE & TELEGRAPH COMPANY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued May 3, 1971.
Decided August 11, 1971.
*150 Before Judges CONFORD, KOLOVSKY and CARTON.
*151 Mr. William B. Colsey, III argued the cause for appellants (Messrs. Powell, Davis, Dietz & Colsey, attorneys).
Mr. Franklin H. Berry, Jr. argued the cause for respondents (Messrs. Berry, Summerill, Rinck & Berry, attorneys).
The opinion of the court was delivered by CARTON, J.A.D.
This action is a sequel to two earlier consolidated actions brought by plaintiffs Spiegle against defendant Borough of Beach Haven. In the earlier proceeding our Supreme Court upheld two borough ordinances as reasonable exercises of police power. The first one prohibits erection or maintenance, without a permit, of fences or other structures on privately-owned ocean beachfront property (fence ordinance). The other perpetuates a sand dune area through both public and private property (dune ordinance). This dune ordinance is intended to prevent increased westward encroachment by the sea and authorizes the borough to construct and maintain a dune area. The effect of this ordinance, described more fully hereinafter, is to prohibit construction of habitable structures east of a designated building line.
Holding that plaintiffs had not sustained the burden of proving that the dune ordinance deprived them of the beneficial use of their property, the court stated that its action was "without prejudice, however, to any further proceedings based upon a claim and showing of an actual taking of a beneficial use." Spiegle v. Beach Haven, 46 N.J. 479, 494, cert. den. 385 U.S. 831, 87 S.Ct. 63, 17 L.Ed.2d 64 (1966).
Although various forms of relief are requested in connection with the alleged interference with plaintiffs' rights, in essence plaintiffs' present action against defendants Borough of Beach Haven and American Telephone and Telegraph Company is one based upon the claim of deprivation of beneficial use of their property without compensation. Specifically, in the first count plaintiffs seek a declaratory *152 judgment as to their rights in the beds of certain dedicated but unaccepted streets and in the abutting beachfront properties, as against defendant borough, along with an adjudication of the unconstitutionality of certain other ordinances, referred to later in this opinion, as they affect plaintiffs' property interests. The second count seeks money damages and injunctive relief against defendant American Telephone and Telegraph Company for trespass grounded on the claim that plaintiffs sustained damages by reason of the installation of an overseas cable in the bed of one of the streets running to the oceanfront. The trial judge granted summary judgment and dismissed the complaint as to defendant American Telephone and Telegraph Company because its use of the property was authorized by an easement granted by defendant borough.
The trial, requiring some 1,000 pages of transcript and involving numerous exhibits, was directed primarily toward two issues: (1) whether the use by the public and by defendant borough of those portions of the Spiegle property east of the building line had been of such a nature and duration as to create a prescriptive easement in the public for beach purposes and in the borough for beach protection activities, and (2) whether plaintiffs could make any economic or beneficial use of their property eastward of the building line so as to establish an uncompensated taking of the beneficial use.
The trial court ruled against plaintiffs on these main issues and made various additional rulings as to the nature of plaintiffs' interests in the beds of the streets and as to their claimed right in accreted lands. Plaintiffs now appeal from the summary judgment granted in favor of American Telephone and Telegraph Company and from those portions of the judgment on the first count adverse to them.
For a better understanding of the various issues involved, it is necessary to set forth the factual background and a general description of the five parcels of property involved. *153 The Supreme Court opinion (46 N.J. at 482) refers to and describes only four of the parcels. These will be described in detail later in this opinion. Appended is a diagram which reproduces, in reduced form, the area involved as it appears in one of the exhibits, upon which we have superimposed additional explanatory notations.
Between 1957 and 1964 plaintiffs acquired title through various conveyances which referred to and were delineated as various lots on a map filed in the Ocean County Clerk's Office, known as "Plan of Subdivision of Beach Haven, Island of Long Beach, Ocean County, New Jersey, Beach Haven Heights Company." These properties are located in the southern portion of defendant borough, a municipality near the southerly end of Long Beach Island. As shown on the current tax map of the borough (on which the numbering system differs from that of the filed subdivision map), the Spiegle properties involved in this action encompass five oceanfront tracts.
The first and most northerly tract, bounded on the north by Jefferis Avenue, on the east by Beach Avenue and on the south by Kentford Avenue, is described on the tax map as one-half of Lot 12 and all of Lots 13 and 14, Block 42. This parcel is unimproved.
The second tract consists of Lots 7 through 10, Block 21, and is bounded northerly by Kentford Avenue, easterly by Beach Avenue (which is to some extent a paper street as will be indicated later in this opinion) and southerly by Leeward Avenue. In 1961 plaintiffs built a one-family, two-story residence on this tract abutting the north side of Leeward Avenue.
The third tract, encompassing part of Lot 8, Lots 9 through 12, and Lot 14, Block 20, is bounded northerly by Leeward Avenue, easterly by Beach Avenue and Lot 13, and southerly by Merivale Avenue. In 1958 plaintiffs erected a small, two-story, frame apartment house called the "Sand Castle," fronting on the south side of Leeward Avenue, on Lot 9 and part of Lot 8.
*154 The fourth tract, which is unimproved, consists of Lots 9 and 10, Block 19, and spans the area between Merivale and Nelson Avenues.
The fifth tract, also unimproved, consists of Lot 3, Block 18. This parcel abuts the south side of Nelson Avenue.
Each parcel is, at least in part, east of the "Dune Area."[1] Under the dune ordinance, as noted above, no habitable buildings may be constructed eastward of the building line.
Over the years the borough has paved Nelson, Merivale, Leeward and Kentford Avenues eastward up as far as the beach or strand area. Water, gas and sewer mains have been installed in these streets, terminating near the end of the paved portions. Beach Avenue, the most easterly northsouth street, was paved as far south as Liberty Avenue almost four blocks north of plaintiffs' most northerly tract. The remainder of its bed, as shown on exhibits received in evidence, remains either unpaved and on the strand or below the mean high water line of the Atlantic Ocean.
The following excerpt from the trial judge's letter opinion accurately summarizes the topographical setting of Long Beach Island, particularly the area in the vicinity of plaintiffs' property, the continuing efforts of various governmental agencies to protect the shoreline from deterioration resulting from storms and erosion, and the effect of the savage storm of 1962:
As with all barrier beaches along the Atlantic coast, the entire length of [Long Beach] island including the Borough was originally bordered along its easterly side at varying distances from the mean high water line by a continuous chain of sand dunes. These served to help protect the island from the ravages of the sea and constituted an effective barrier until man changed their profile or removed them completely. In the Borough those dunes remaining are immobilized by natural vegetation, dead tree branches and fencing.
The topography of the Borough is such that it slopes gradually from the top of the dunes in a westerly direction to Little Egg Harbor *155 and drops much more precipitately eastward to the mean high water line of the Atlantic Ocean.
Since the early 1920's the Borough's easterly shore line has suffered much erosion and some subsequent accretion. To stabilize the beach area and protect the remainder of the Borough, the State and Federal Governments have at various times joined with the Borough in expending funds to erect and maintain jetties and groins to lower the force of the littoral current and encourage accretion. Public monies have also been expended in piping sand from Little Egg Harbor Bay across the Borough to partially replace sand scoured from the beach by tides and storms. The Borough has erected fencing and used tree limbs and other sand-catching devices in the dune area to assist in enlarging and stabilizing the dunes and the beach eastward to them.
All of these means have been employed in the area of the Spiegle property for the purposes enumerated.
On March 6 and 7, 1962 New Jersey was struck by a hurricane preceded by several days of strong northeast winds. As a result of the storm and tidal action many homes on the island including a number in the Borough near the Spiegle property were destroyed or severely damaged. In the Kentford to Nelson Avenue area the protective dunes were so completely leveled that two witnesses described it as "flat as a prairie."
It was after the 1962 hurricane that the borough adopted the dune ordinance designed to perpetuate the protective sand dunes bordering the Atlantic Ocean. As noted above, no habitable structure was permitted to be constructed in the Beach-Dune Area (that area lying easterly of the building line). The ordinance is set forth at length in Justice Haneman's opinion in Spiegle and need not be repeated here.
In early 1967, subsequent to the Supreme Court's decision in the earlier actions, plaintiffs applied to the borough's governing body for a fence permit pursuant to the borough's fence ordinance and to the building inspector for permits to erect a one-family dwelling on the first, or most northerly tract, on the north side of Kentford Avenue and a four-family apartment on Lots 9 and 10, Block 19 (the northerly half of the fourth tract), fronting on Merivale Avenue.
Plaintiffs received no response to their request for a fence permit. Both applications for building permits were denied because the construction planned in both extended eastward *156 of the building line and were therefore violative of the dune ordinance, and because it would have been impossible to provide road access or utilities to the proposed buildings. This action then ensued.
The Spiegles and the borough agree that the paved portions of the streets adjacent to Spiegles' lands have been accepted and maintained by the borough. The Spiegles claim a superior interest to that of the borough in the unpaved portions of the streets which lie on the beach and have never been formally accepted by the borough. They further contend that accretion of land following earlier erosion has extended their property rights to the mean high water line of the ocean. They assert that as a consequence the borough has no right to use or regulate these properties and that the public may not utilize these tracts for beach purposes.
The trial court determined that the public has acquired an easement for beach purposes and that the borough had the right to provide for protection of the adjacent lands from the ravages of the sea by utilizing all of plaintiffs' property east of the building line. However, the court found that the borough had relinquished its beach easement to that portion of Block 20 consisting of all of Lot 9 and those portions of Lots 10, 11 and 12 lying behind plaintiffs' bulkhead although east of the building line. It concluded also that plaintiffs were not entitled to the issuance of building permits by reason of the easement which the court ruled had been acquired for beach purposes. As a consequence of that prescriptive right, the court upheld the right of the municipality to regulate the use by ordinance of beach buggies.
Preliminarily, we note our agreement with the trial judge's ruling that plaintiffs had no ownership interest in any accreted lands oceanward of their property lines. We agree also with the court's conclusion that the municipality had accepted the dedication of the paved portions of the streets running easterly to the dune line and that it had not abandoned or relinquished its right as to the future use *157 for street purposes of the portions of these streets extending easterly of the building line. Since the borough has not appealed from the trial court's direction that condemnation proceedings be brought as to such portions of the unaccepted but dedicated streets that have been used by the public for beach purposes, we express no opinion as to whether the municipality had a right to use such street areas for beach or other purposes without paying just compensation to the Spiegles.

PRESCRIPTIVE EASEMENT
In our opinion, the record does not justify the finding that those portions of the Spiegle lands lying east or oceanward of the building line were subject to a public easement for beach purposes by reason of adverse user under N.J.S.A. 2A:14-6. In arriving at this conclusion we attach no great significance to the fact that the high-water line of the ocean may have advanced several hundred feet landward since the 1930 subdivision map was filed.
To obtain any prescriptive right, entry and possession must have persisted for the required statutory time (20 years) and must have been exclusive, continuous, uninterrupted, visible and notorious, although not necessarily accompanied by a knowing intentional hostility by the user. Mannillo v. Gorski, 54 N.J. 378, 386 (1969). Any interest asserted through a claimed prescriptive easement must be judged by these same standards. Baker v. Normanoch Ass'n, Inc., 25 N.J. 407, 419 (1957).
We are not satisfied that the evidence as to public user, particularly during the period prior to plaintiffs' first acquisition of their property in 1957, even considering the seasonal nature of the use, was of such frequency or of such character as to justify an inference of continuous or uninterrupted use or that such use was without the implied permission of the owners. In determining whether the beach area has been used sufficiently continuously or so intensely *158 as to establish a prescriptive right, we have given consideration not only to the character of the acts constituting the alleged use but also to its natural condition prior to the 1950's when the borough's use became more intense. Although the 60-year prescriptive period established by the Legislature for woodlands and uncultivated tracts is not made applicable specifically to beachfront property, the general rule would seem to apply here that where land is in a general state of nature and left unimproved by its owner, sporadic or even customary use of such property by a mere user is presumably permissive if there has been no actual deprivation of any beneficial use to the owner. See Meyers v. Pavalkis, 73 N.J. Super. 208 (App. Div. 1962); Annotation, "Prescriptive Easements  Presumptions," 170 A.L.R. 776, 820 (1947). This conclusion is apart from any consideration of the legal question whether the public at large could acquire such an easement. Cf. Albright v. Cortright, 64 N.J.L. 330, 334-335 (E. & A. 1900).
The testimony indicated that members of the public had used the paved ends of the streets toward the ocean to gain access to the beachfront and to the water for fishing and bathing purposes, and that this beach area had never been closed off. Several residents of the borough, whose memory extended back to the mid-1920's, testified that the foreshore of the beach had been used as an access way  principally by horsedrawn wagons  to Long Beach Township and to the inlet south of the borough for some 50 years. About 1914, long before the establishment of any lifeguards or maintenance of any public beaches along the beachfront, the beaches had been used by various unidentifiable people for the purpose of fishing and bathing. The beach area had been patroled seven days a week by the life-saving service of the U.S. Treasury Department. A resident of the borough since 1891, who had been a tax collector, graphically described the tranquil, almost desolate character of the beachfront areas in those early days. As a boy he had set rabbit traps there. There was no public bathing beach and *159 there were no lifeguards. People would walk on and fish from the beach area without objection from any quarter. The beachfront had been relatively uninhabited and undeveloped.
During the period from 1929 to 1942 there were still no lifeguards in the vicinity of the Spiegle property but the borough did clean the beach and would occasionally employ bulldozers to push the sand up to protect the street ends. This type of activity, to which plaintiffs have made no objection, has continued to the present time.
A borough resident testified that during his term as mayor (1950 to 1962) the borough had constructed the groins opposite Nelson and Jefferis Avenues extending into the ocean. These were designed to promote the building up of the beach, and did accomplish this objective.
Thus, until recent years use of the beaches, apart from cleaning and protective work performed by the municipality, appears to have been confined to occasional fishing, swimming and sunbathing by unidentified users. Significantly, none of the witnesses for the municipality could identify any of the individual users of the beach area other than themselves. Even up to 1960, as one witness who served as a lifeguard in the area testified, "There were very few people there and you were kind of interested if you saw one or two people besides the Spiegle family."
Describing the use of the beach after he had first purchased property in Beach Haven in 1957, Spiegle testified:
The beach was rarely traveled except maybe a few beach buggies once in a great while. Once in awhile a casual passer-by would go by. Once in a great while you would see a fisherman throw a line in the surf. And in the summertime, occasional bathers would be here and there. That's about all.
By 1959 slightly larger numbers of persons were using the beach. Spiegle installed poles on the northerly boundary line of his property extending to the water to keep the *160 beach in front of the Sand Castle apartments "a little more private." He claimed that he could recall only one complaint voiced by the borough about the poles and another by a neighbor in 1960.
It was only after 1960 that the borough began to post the beachfront with flags and lifeguards and restricted the swimming off the Spiegle property. Surfing in the waters in front of plaintiffs' property began only in 1963. Other than a 1967 surfing contest carried on with plaintiffs' consent, the Spiegles neither objected nor consented to this surfing activity.
A former lifeguard testified that he was responsible for enforcing borough rules restricting swimming in certain areas of the ocean in 1963 and 1964. The borough at that time limited the activity to the surf south of the north end of the Sand Castle apartments. Although the witness had used the beach as early as 1960, he could not recall seeing any lifeguards there until the following year. From that time public use of the beach areas increased.
The mayor of Beach Haven testified that the first borough lifeguards were first stationed at or around the Spiegle beachfront in 1961 or 1962. Spiegle had made no objection to the presence of a lifeguard in the area. During the mayor's residence in the borough (since 1957), the beaches, including the Spiegle property, had always been open to members of the public who used these areas for swimming, fishing, riding beach buggies, and other beach activity. During the summer months the borough sent a truck down to the beach to pick up debris almost every day. Borough employees used the street, both paved and unpaved, to gain access to the beach for the purpose of policing it and maintaining it. However, patrol of the beach by beach buggie had not been instituted until 1964.
As outlined above, the borough's activities as to the beach area involved included construction of timber jetties and maintenance and preservation of the beach areas from the 1930's to the present. Fences were constructed to prevent *161 the sand areas from eroding. During the 1950's stone groins were constructed opposite Nelson and Jefferis Avenues.
Although the beach was always accessible to the public, it was not frequently or habitually used. More important, the borough made no effort to create a controlled public beach until the early 1960's. Nor did it attempt to regulate use of the beachfront until 1960 or 1961. Cf. Brindley v. Lavallette, 33 N.J. Super. 344 (Law Div. 1954). Use of this area by the borough prior to that time was not necessarily inconsistent with the property owner's rights. For the most part, its activity was directed toward protecting the integrity of the beach and maintaining it by collecting refuse. The landowners did not, nor would they have any reason to object to the borough's beneficial and possibly benevolent beachfront programs.
We conclude that the borough's activities were not of such a nature as to destroy any property rights in the property owner or to create a prescriptive easement for beach purposes in the public through the borough's activities prior to 1960. That is not to say that the borough may not have obtained a prescriptive easement to maintain the beach area itself. Assuming the validity of such a limited use, it does not derogate from the fact that the beneficial use totally remained in the property owner.
We express no opinion as to the nature and extent of plaintiffs' right and title as against any claim on the part of the State that it may have acquired prescriptive ownership of this segment of the beachfront by reason of its having been submerged by the high water line at one time.

RIGHT TO COMPENSATION
We consider now whether plaintiffs have sustained the burden cast upon them of proving that the dune ordinance unduly burdens the beneficial use of their property.
The trial judge did not reach this issue because of his conclusion that the public had acquired a prescriptive *162 easement to use the property for beach purposes which would preclude erecting buildings on it. In view of the fact that this litigation is already of long-standing duration, and since the record is adequate, substantial justice requires that we exercise our original fact-finding jurisdiction and make the necessary findings and conclusions in relation to this issue.
The testimony establishes that major storms of hurricane intensity struck Beach Haven in 1944 and 1962. Much of the testimony adduced at the trial and most of the pictorial exhibits reproduced in defendant's appendix relate to the damage done by those storms. Several homes nearby and to the west of the Spiegle properties were completely destroyed during the 1962 storm during which the ocean and bay waters merged at high tide over the southern portion of the borough. The present Spiegle home (which is west of the current building line) and the Sand Castle apartment building (which straddles that line) received lesser damage from the storm, the foundation under the latter being weakened and the bulkhead in front of it being destroyed. During lesser storms, especially during the winter and early spring, the ocean frequently approaches to within a few feet of the Sand Castle apartments, lapping up against and sometimes over the bulkhead in front of it.
By way of background information, the building line was established by the 1964 map. It generally paralleled the dune area which ran parallel to the shore line. William H. Taylor, a consulting civil engineer whose firm was the borough engineer until 1966, said the line was fixed in such a way that he would not consider it safe to build east of it. Homes located inland could be endangered by the destruction of beachfront houses if, for example, debris from the demolished home was swept inland by the ocean waters. Moreover, if the sewer lines connected to a home on the beach were to be ruptured by a storm, the municipal sewer system could become clogged with sand.
Plaintiff Robert D. Spiegle countered that there were several homes in Beach Haven built prior to the establishment *163 of the building line and either east of its current position or on the dune area itself. These houses, belonging to his sister-in-law and father-in-law, were not severely damaged in the 1962 storm. Both homes were serviced by all the normal utilities. On this basis plaintiffs argue that a dwelling could be safely built totally east of the building line.
None of this testimony is conclusive as to whether there has been a deprivation of a feasible use in the property. Beyond that we must consider the topography and geography of each lot involved in conjunction with the expert testimony presented by both sides.
We consider first the more northerly parcel consisting of one-half of Lot 12 and Lots 13 and 14, Block 42, on which plaintiff proposes to erect the one-family residence. This lot fronts on an unimproved portion of Beach Avenue for a distance of 100 feet and abuts the north side of an unpaved part of Kentford Avenue the same distance. The tract straddles the dune area which runs in a generally northeasterly direction through the lot. The elevation at the top of the dune at the north property line is 16.59 feet and 18.11 feet at its south line. The average elevation above sea level of the property entirely east of the dune area is about nine feet. That portion of this tract west of the dune area averages about 15 feet in elevation. The top of the dune is about 30 feet from the westerly property line at its northerly end and about 25 feet at its southerly end. The lot is 100 feet in depth  about 70% of which lies easterly of the top of the dune.
The residential structure proposed to be erected by plaintiffs would straddle the dune area with about 40% of it lying easterly of the top of the dune. The lot line itself is about 24 feet east of the paved end of Kentford Avenue.
Defendant's expert witness, an engineer who has impressive experience in beachfront construction, having assisted in the design of some 160 beachfront structures of which about 60 were residences, conceded that from a structural *164 standpoint a residence could safely be constructed on top of the dune as planned, although he had reservations as to the particular plan submitted by Spiegle. As to the necessary utilities, including a sewage line, the witness admitted they could be brought in, although there would be some danger of having them washed out.
Although construction of a structure straddling the dune area could have a detrimental effect on the dunes themselves and would be subject to hazards from unusual storms, we are satisfied from all of the evidence that a safely constructed residence could be built on this lot and that plaintiffs, in making application for a building permit, had a sincere intention of using the property for that purpose. We further observe that the dune area itself will afford protection to the utilities servicing the residence, since those conduits leading to the proposed structure can be located behind the building line.
Our conclusion finds considerable support from the fact that a residence was constructed before the 1962 hurricane on a parcel of property immediately to the north of this tract having substantially the same physical characteristics as plaintiffs'. That structure has remained habitable to the present time. That the borough has assessed these parcels at a nominal value does not reduce the utility or limit the reasonable use of that property. Consequently, we find and conclude that the prohibition against all residential construction on this particular tract should be deemed to constitute a taking for which the plaintiffs should be fairly compensated.
The tract on which plaintiffs propose to erect the four-family apartment consists of two adjoining lots (Lots 9 and 10, Block 19 on the tax map). Lot 9 has a frontage of 40 feet on the south side of Merivale Avenue, while Lot 10, of equal size, fronts on the northerly side of Nelson Avenue. Both of these lots lie entirely east of the building line. A small strip of Lot 9 consisting of about 14 feet in width in the northwest portion and dwindling to about two *165 feet at the southwest border is within the dune area. The remainder is on the beach. Lot 10 is 98% beach or plateau property. Both lots are about ten feet east of the end of the paved street area. The elevation above sea level of that portion of the tract located within the dune area ranges from 10 to 12 feet, while the remainder is about eight feet.
In 1963 this tract was about 100 feet landward of the mean high water line. However, as recently as 1957 virtually all of Lot 10, the more southerly of these two lots, and almost half of Lot 9 lay under the mean high water line and were washed lands. Van Dyke, a realtor, testified that he had observed this particular parcel partially under water on the day before he testified at the trial in July 1968.
Plaintiffs' expert witness, North, maintained that a residential structure, either a single or multi-family house, could safely be built on this property, as well as anywhere on the beach area  even into the surf. He acknowledged that such a house would have to be erected on pilings of timber or steel rising about 12 feet in the air. Although it would be necessary to construct a connecting sewer line across or under the beach, install a pump (because of the elevation of the house), and run the sewer line upward into the structure, and a similar procedure utilized for all other utilities, he felt this also could be safely accomplished and was feasible from an economic standpoint. However, he offered no opinion as to the cost involved.
On the other hand, Nelke, defendant's expert, while conceding that from a strictly engineering standpoint a structure designed for residential purposes could be safely erected on beachfront property lying east of the building line, maintained that it could not safely or economically be supplied with utilities, particularly sewerage connection.
In his view, any residential structure on the Spiegle site would be economically unfeasible to construct and impractical to maintain because of the hazards from wind and water to which it would be subjected. Such a residence, he observed, would be vulnerable not only to the more catastrophic *166 storms such as occurred in 1944 and 1962, but also to any storm which he referred to as a "normal northeaster" in which the wind velocity reached 50 to 60 miles per hour and the average tides ran to 12 or 14 feet.
Since utility services would have to extend from the street over or under the exposed beach area to the structure, these lines could be ruptured from hurricane or heavy storm conditions, thus depriving the building of the habitability necessary for safe human occupancy. Furthermore, the disruption of the sewer lines could result in their becoming filled with sand, thus endangering the borough's entire sewerage system. Likewise, a rupture in the water lines might result in the municipal water tank being drained. Rupture of a gas line (if the house were served with gas) would also create a dangerous condition. Nelke maintained that it would not be practical to afford protection of the utility lines on the plateau area of the beach and that road service could not be provided or feasibly sustained.
Our review of the evidence as to the physical characteristics of this tract and the hazardous conditions to which it might be subjected because of its location satisfies us that although it may be possible from a strictly engineering standpoint to erect a residential structure on the site with supporting utilities, it would not be safe or economically feasible to do so from a common sense standpoint. As with any health or safety regulation, the interest of one property owner must be subjected to some degree to the welfare of the general public. Weighing the interest of the property owner against that of the public, we are satisfied that this tract has no present beneficial use for residential construction, absent an outlay of money out of all reasonable proportion to the use to be derived from it and the imposition of an unreasonable hazard on the public. We conclude that plaintiffs are entitled to no compensation as to this property.
The tract between Merivale Avenue and Leeward Avenue comprises a series of lots including 9 and part of 8, Block 20 on which the Sand Castle apartment building is located. *167 A bulkhead was constructed by the Spiegles eastward of Sand Castle to protect it from water damage and erosion. All of Lots 10, 11 and 12 and approximately one-half of Lot 14 are entirely easterly of the dune area. Much of the area, excluding Lot 14, was also under the 1956 high water line. Additionally, more remote portions thereof were washed by the highest tides at that time. Plaintiffs' exhibit indicated that the elevation of these lots ranged between about five feet above the water line at the lowest point in the northwest corner to about 17 feet in the most south-westerly corner near the dune line. The tract in its entirety lay above the 1963 high water line.
For the reasons related above in connection with the proposed apartment house tract in Block 19, we conclude that plaintiffs have not demonstrated a denial of any beneficial use of this property by the dune ordinance and that they are entitled to no compensation therefore as to Lots 10, 11 and 12. As to Lot 14, there is no evidence in the record which would justify the awarding of compensation as to that particular parcel irrespective of the fact that its physical characteristics differ from those of Lots 10, 11 and 12.
Furthermore, that no buildings may be constructed on those lots lying totally or partially east of the building line does not deprive the Spiegles of the beneficial use of the property for beach purposes adjunct to their use of Lots 8 and 9 (Sand Castle). Therefore, we conclude that there is neither a showing of deprivation of economic benefit nor an unreasonable restriction on the use of plaintiffs' property discussed above.
The Spiegle property in Block 21 also consists of a series of lots extending across both sides of the dunes. The portion comprising Lot 8 has a 100 feet frontage on the north side of Leeward Avenue and runs northerly to Kentford Avenue where it has a similar frontage. Both Leeward and Kentford are unimproved at these points. All of Lot 8 lies entirely east of the dune area except a strip of about 20 *168 feet in width at the southerly end extending to 25 feet at its most northerly point running along the lot's westerly border. Plaintiffs' exhibit shows that the elevation above sea level of this lot ranges from somewhere between 6.30 feet and 6.70 feet on the easterly portion to approximately 15 feet on the westerly property line.
The geographic and topographic characteristics of Lot 8 are substantially similar to Lots 9 and 10, Block 19 and Lots 10, 11 and 12, Block 20 as discussed above. For the reasons set forth in the discussion of those, we conclude that plaintiffs' property here is reasonably suitable for beach purposes only. Since this particular parcel may be used for such purposes in connection with plaintiffs' abutting properties, we conclude that they have not been denied any reasonable beneficial use in reference to it.
As to Lot 3, Block 18 the record is insufficiently developed as to its particular characteristics to allow a final determination as to plaintiffs' right to compensation.

INCIDENTAL QUESTIONS
Our determination that plaintiffs own certain beach areas necessitates our finding that they are entitled to the issuance of a fence permit for those properties, provided they comply with the fence ordinance. For a like reason we determine that the borough ordinances regulating beach buggy and surfing activities have no application to property privately owned by plaintiffs.
There is no dispute that the borough has accepted the paved portions of the dedicated streets running to the beach. As to those portions of the mapped streets not yet paved, we agree with the trial court that the borough has never relinquished the right to accept them. "Mere passage of time will not ordinarily bar an acceptance unless the offer is expressly conditioned upon acceptance within a limited time." Velasco v. Goldman Builders, Inc., 93 N.J. Super. 123, 137 (App. Div. 1966).
*169 An acceptance of an offer of dedication may be effectuated by any official conduct which manifests an intent to treat the land in question as dedicated to the public use. The borough's grant of the franchise to American Telephone and Telegraph Company to lay cable in the Leeward Avenue street bed clearly evidenced such dominion as to constitute an acceptance of that particular section of the dedicated street. The acceptance is further evidenced by the continued use of the easterly end of the roadbed for access to the beach areas by both the municipality and the public. See Cunningham and Tischler, "Dedication of Land in New Jersey," 15 Rutgers L. Rev. 377 (1961); see also Sarty v. Millburn Tp., 28 N.J. Super. 199, 205-206 (App. Div. 1953).
We need not decide the further question whether acceptance of part of a dedicated street may constitute acceptance of the whole of the dedication.
Consequently, we affirm the dismissal of the complaint and the grant of summary judgment as to defendant American Telephone and Telegraph Company.
The final issue required to be resolved is plaintiffs' incidental challenge to the validity of that section of the borough zoning ordinance establishing a percentage of damage beyond which a nonconforming construction may not be replaced or reconstructed. The trial court did not pass on this issue. The applicable statute (N.J.S.A. 40:55-48) provides for restoration or repair in the event of partial destruction of the nonconforming structure. "What constitutes `partial destruction' must depend upon the facts of each case * * *. We go no further * * * than to hold that a percentage delineation by ordinance is not authorized." H. Behlen & Bros. v. Mayor, etc., of Kearny, 31 N.J. Super. 30, 39 (App. Div. 1954). We deem H. Behlen & Bros. controlling in this case and accordingly declare the section of the zoning ordinance in question invalid.
*170 That portion of the judgment adjudicating that the public or the borough has acquired a prescriptive easement for beach purposes over plaintiffs' property is reversed.
Defendant borough is ordered to institute eminent domain proceedings against plaintiffs as to Lots 13 and 14 and one-half of 12, Block 42 on the tax map.
As heretofore mentioned, the borough has not appealed from that portion of the judgment directing institution of eminent domain proceedings with respect to the street areas currently being used for beach purposes. That portion of the judgment therefore remains undisturbed.
The remainder of the judgment is affirmed for the reasons given by the trial court except as to Lot 3, Block 18, for which compensation is denied without prejudice to plaintiffs' right to seek condemnation on the basis of a future claim of deprivation of beneficial use if the municipal ordinance is ever raised as a bar to any effort by plaintiffs to make such use.
No costs.
*171 
NOTES
[1] The "Dune Area" as opposed to the "Beach-Dune Area" is that land, about 20 feet in width, lying between the bulkhead and building lines. See Spiegle v. Beach Haven, supra (46 N.J. at 489).