878 A.2d 815

SOPHIE BUBIS AND ALCIDES FERREIRA, PLAINTIFFS–APPELLANTS, v. JACK A. KASSIN AND JOYCE KASSIN, HUSBAND AND WIFE, DEFENDANTS–RESPONDENTS, AND BOARD OF TRUSTEES OF THE VILLAGE OF LOCH ARBOUR, DEFENDANT.

Argued February 1, 2005—Decided August 10, 2005.

614

*Leonard S. Needle* argued the cause for appellants.

*David C. Apy* argued the cause for respondents (*McCarter & English,* attorneys).

Justice ZAZZALI delivered the opinion of the Court.

As this appeal illustrates, good fences do not always make good neighbors. Defendants' creation of an approximately eight-foot high sand berm, topped with six-foot tall trees, for the purpose of ensuring defendants' privacy, has bred extensive litigation and disharmony between these neighbors.

To finally resolve this ten-year-old dispute, we must determine whether the berm constitutes a fence for the purposes of applying a restrictive covenant and a local zoning ordinance. Because the berm is a fence that is more than six feet tall, we conclude that it violates both the restrictive covenant and the ordinance.

## I.

### A.

In 1978, plaintiff Sophie Bubis and her late husband purchased the property at 1 Ocean Place in the Village of Loch Arbour, New Jersey. That property is directly across the street from the beach. Prior to 1995, Bubis could view the beach and ocean from the first floor of her home through a chain-link fence on the beach property.

In 1995, Jack and Joyce Kassin purchased the beach property. The entire Kassin parcel comprises two-thirds of the beachfront property in Loch Arbour. The Kassins converted it from a privately owned beach that was open to the public for a fee to a private beach for the exclusive recreational use of their family and friends. Later that year, they erected an eight-foot high sand

berm behind the existing six-foot chain link fence by pushing sand into a heap along the western boundary of their beach property. To further ensure their privacy, the Kassins topped the berm with bushes and trees. At the time of the complaint, the height of the berm, trees, and shrubbery together measured approximately fourteen to eighteen feet.

Initially, we provide a brief description of the physical layout of the property at issue. Running from east to west are the ocean, the beach, the berm, the chain link fence, the street, and the Bubis home. The berm effectively ensures the Kassins' privacy and prevents Bubis from viewing the beach and ocean from her home.

## B.

This appeal implicates both a restrictive covenant and a local zoning ordinance. First, an 1887 restrictive covenant prohibits the construction of fences higher than four feet on the Kassins' property. Both Bubis and the Kassins bought their properties subject to that covenant. Second, a municipal zoning ordinance regulates land use in the Village of Loch Arbour. The Bubis and Kassin properties are located in the "beach" or "B" zone of the village. The ordinance states that the purpose of the beach zone "is to preserve the existing natural beach area and dunes which are present in the Village for their unique beauty and recreational assets." Unlike the sections of the ordinance governing residential and commercial zones, which allow fences and walls as accessory uses to the property, the section relevant to the beach zone did not list any accessory uses prior to 1996. In 1996, Loch Arbour amended its ordinance to include the following language: "All fences shall be made from a chain link or similar fencing material. The use of webbing or any other such material through or attached to a fence of the chain link type is prohibited." Moreover, such fences "shall have a maximum of height of 72″ above the ground." The ordinance, in a section that pertains to all zones, reiterates that "[n]o fences or hedges on any interior lot line shall be higher than 6 feet."

Apart from the restrictive covenant and the zoning ordinance, New Jersey's Department of Environmental Protection (DEP) regulates the creation and maintenance of dunes, pursuant to the Coastal Area Facility Review Act (CAFRA), *N.J.S.A.* 13:19–1 to – 33; *N.J.A.C.* 7:7E–3A.3. The DEP defines a dune as "a wind or wave deposited or man-made formation of sand (mound or ridge), that lies generally parallel to, and landward of, the beach and the foot of the most inland dune slope." *N.J.A.C.* 7:7E–3.16(a).

## C.

This is the third appeal filed in this litigation, which commenced in 1995. The complex procedural history and facts relating to the two prior appeals have been set forth in detail in published opinions at 323 *N.J.Super.* 601, 733 *A.2d* 1232 (App.Div.1999) (*Bubis I* ), 353 *N.J.Super.* 415, 803 *A.2d* 146 (App.Div.2002) (*Bubis II* ), and in the most recent, unreported Appellate Division decision (*Bubis III* ). Because most of that background is irrelevant to the resolution of the questions presented here, we focus only on the essential facts and procedure.

In *Bubis II, supra,* the Appellate Division rejected the Kassins' argument that the restrictive covenant had been abandoned. 353 *N.J.Super.* at 426 n. 2, 803 *A.2d* 146. The Appellate Division explained that an accepted and ongoing "violation[ ] [of the restrictive covenant has] resulted in a modification of the covenant under which a six-foot-high chain link fence of the sort maintained by the Kassins is not prohibited." *Ibid.* (Citation omitted). As a result, the Appellate Division concluded that the covenant now restricts fence height to six feet rather than four feet as stated in the original covenant. *Ibid.* The panel remanded to the Chancery Division for consideration of Bubis's argument that the Kassins' berm constituted a fence that violated the zoning ordinance. *Id.* at 431, 803 *A.2d* 146.

On remand, Bubis filed a second amended complaint alleging that the berm was the functional equivalent of a fence that violated both the restrictive covenant's limitation on fence height

and a similar provision in a Loch Arbour zoning ordinance. The Chancery Division heard testimony from Bubis and two licensed professional planners and considered the deposition testimony of Loch Arbour's zoning code enforcement officer. The testimony conflicted concerning whether the berm constituted a fence as Bubis claims or a dune as the Kassins contend.

The Chancery Division held that the berm was not a fence, but rather was a dune that was not subject to the height limitations in the covenant or ordinance. After surveying various definitions of "fence," the court found that dictionary definitions were not determinative and that the ordinary meaning of "fence" did not include "dune." The court also held that, in any event, CAFRA, which regulates the creation and maintenance of dunes, preempted the ordinance, making its height limitation inapplicable.

Bubis appealed the ruling of the Chancery Division. In an unpublished opinion, *Bubis III,* the Appellate Division affirmed the lower court's conclusion that the berm did not violate the restrictive covenant. Describing the chancery court's decision as "a commonsense interpretation of the term 'fence,'" the panel explained that the covenant did not prohibit dunes generally because, at the time the covenant was created, dunes already existed on the property. The panel also held that the berm was not a fence under the ordinance since it was not made from "chain link or similar fencing material." In dicta, the panel concluded that CAFRA and the ordinance did not conflict in this case, so no preemption issue arose.

We granted Bubis's petition for certification. 181 *N.J.* 548, 859 *A.*2d 693 (2004).

## II.

Bubis asserts that the approximately fourteen-foot high vegetated berm violates the restrictive covenant because it is the functional equivalent of a fence in excess of four feet, and, further, that the dune satisfies the dictionary definition of "fence." Bubis emphasizes that the vegetated berm is not a dune under CAFRA.

Finally, Bubis suggests that the lower courts did not properly analyze whether CAFRA preempts the zoning ordinance in this case.

The Kassins argue that the berm is a dune that does not violate the covenant or the ordinance because it is not within the ambit of the ordinary meaning of the word "fence" as used in either source. Alternatively, the Kassins assert that CAFRA's dune regulations preempt the zoning ordinance.

We consider first whether this berm is a fence, and second, if it is, whether it violates the restrictive covenant and the zoning ordinance. Finally, we examine the Kassins' preemption claim.

### III.

### A.

Because neither the restrictive covenant nor the zoning ordinance defines the term "fence," we must rely on other sources in deciding whether this berm is indeed a fence.

*Black's Law Dictionary* defines a fence as a

hedge, structure, or partition, *erected for the purpose of* inclosing a piece of land, or to divide a piece of land into distinct portions, or to separate two contiguous estates. An enclosure about a field or other space, or about any object; especially an enclosing structure of wood, iron or other materials, *intended* to prevent intrusion from without or straying from within.

[*Black's Law Dictionary* 618 (6th ed.1990) (emphasis added).]

According to *Webster's Third New International Dictionary* 837 (16th ed.1971), a fence is "a barrier *intended* to prevent escape or intrusion or to mark a boundary." (Emphasis added.) *American Heritage Dictionary, Second College Edition* 497 (1995) provides that a fence is a "structure *serving as* an enclosure, barrier, or boundary, usually made of posts, boards, wire, or rails." (Emphasis added.) *Concise Oxford Dictionary of Current English* 357 (7th ed.1989) defines a fence as a "hedge, railing, bank, etc., *preventing* entry to or exit from [a] field etc." (Emphasis added.) And, finally, pursuant to *Webster's II New College Dictionary* 412 (1995), a fence is a "structure *functioning as* a boundary or

barrier, usually made of posts, boards, wire, or rails." (Emphasis added.)

As these varying definitions demonstrate, there is no single construct for the word fence. Nonetheless, they provide two guideposts for our analysis. First, the definitions do not limit the type of material from which a fence can be made. Although each lists materials often used for building fences, these are merely examples as is evidenced by the use of limiting language such as "especially," "usually," and "etc."

Second, each definition centers on the manner of use or the purpose of the structure. The emphasized language indicates that the user's intent and the actual function of the structure are dispositive in ascertaining whether a structure is a fence. From the above definitions, and as a matter of common sense, we can fairly conclude that a fence is defined primarily by its function, not by its composition. As long as the structure marks a boundary or prevents intrusion or escape, then it is a fence, regardless of the material from which it is forged. This is the ordinary understanding of "fence."

In construing a restrictive covenant, a Washington appeals court applied a similar rationale in determining that a row of trees could constitute a fence. *Lakes at Mercer Island Homeowners Ass'n v. Witrak*, 61 *Wash.App.* 177, 810 *P.*2d 27, 30 (1991). The court held that the trial court had erred in holding that trees could not be used as a fence because

> [e]ven the literal meaning of "fences" does not exclude a row of trees along a property line. A common and ordinary meaning of "fence" is "a barrier", *Webster's Third New International Dictionary* 837 (1969), or "a hedge, structure or partition, erected for the purpose of inclosing a piece of land, or to divide a piece of land ... or to separate two contiguous estates." *Black's Law Dictionary* 745 (4th ed.1968).
>
> [*Ibid.*]

Furthermore, our understanding of the term "fence" is consistent with other cases in which courts have found that rows of trees can constitute fences pursuant to spite fence statutes. For example, in *Dowdell v. Bloomquist*, the Supreme Court of Rhode Island

held that, under such a statute, the trial court had properly "considered the proximity of the four trees that touched one another, and the broad span of sixty feet across which they spread, and rationally interpreted that the trees were a fence." 847 *A.*2d 827, 830 (2004). The court explained that, "because of their towering presence, as well as their relative positioning on defendant's land . . . we can consider the trees nothing less than a fence." *Id.* at 831. A California appeals court also held that "a row of trees planted on or near the boundary line between adjoining parcels of land can be a fence or other structure in the nature of a fence." *Wilson v. Handley,* 97 *Cal.App.*4th 1301, 119 *Cal.Rptr.*2d 263, 269 (2002) (internal quotation marks omitted). Although those decisions arose in the context of spite fence statutes, their reasoning nonetheless assists our analysis.

### B.

Turning to the facts in this appeal, we hold that the Kassins' berm satisfies the definition of a "fence." It is a partition that separates the Kassins' property from the street. Although the Kassins argue that the berm cannot be a fence because it is not made of wood, iron, or any typical fencing material, the above definitions and case law demonstrate that a partition need not be so composed.

More important, the Kassins' structure "prevent[s] intrusion from without." *Black's Law Dictionary, supra,* at 429. The Kassins' deposition testimony reveals that, in addition to winterizing their property, they wanted to ensure their privacy and generally deter trespassing. They essentially constructed a privacy fence made of sand and trees that shields the Kassins from the invasive gaze of their neighbors and other passers-by. Indeed, "[s]uch 'fencing' occurs on a regular basis." *Lakes, supra,* 810 *P.*2d at 30. This function contrasts sharply with the environmental protection uses and natural scenic value normally associated with sand dunes. *See, e.g., N.J.A.C.* 7:7E–3.16(c) ("The creation of dunes for the purpose of shore protection is strongly encour-

aged."); *Spiegle v. Borough of Beach Haven,* 116 *N.J.Super.* 148, 151, 281 *A.*2d 377 (App.Div.1971) (stating local "dune ordinance ... intended to prevent increased westward encroachment by the sea"); *Biehl v. N.J. Dep't of Envtl. Prot.,* OAL Docket No. ESA 8499–98, 2000 WL 266399 (Feb. 28, 2000) (stating "dunes are an irreplaceable physical feature of the natural environment possessing outstanding geological, recreational, scenic and protective value"). Despite the Kassins' assertion in their DEP permit application that the berm would protect the beach from winter storms, Bubis's expert testified that, as constructed, the berm cannot protect the beach from erosion because there is no sand behind the berm.

In determining that a row of trees could be a fence, the courts in *Lakes, Dowdell,* and *Wilson* considered the use and placement of the barrier at issue, rather than the material used to create it. Here, the mound of sand topped with a row of trees and shrubs rises at least fourteen feet, nearly two-and-a-half-times the allowed fence height. This establishes a "towering presence" along Ocean Place akin to that created by the trees in the above cases. Moreover, the Kassins' positioning of the structure along the westerly boundary of their premises reveals their desire to partition their property from the street and from neighboring lots. That, of course, is not an illegal purpose, but it does underscore the barrier's function as a fence. Just as the Supreme Court of Rhode Island and the California Court of Appeals found the size and position of trees determinative of whether a structure was a fence, so too, we have considered the span, height, and location of the sand and trees and conclude that this structure is "nothing less than a fence." *Dowdell, supra,* 847 *A.*2d at 831.

We recognize that the DEP issued a permit allowing the Kassins to create and maintain a dune, but such a permit does not determine whether in fact the Kassins actually constructed a dune, a fence, or both. The CAFRA definition of dune is "a formation of sand ... that lies generally parallel to, and landward of, the beach and the foot of the most inland dune slope." *N.J.A.C.* 7:7E–

3.16(a). Regardless of whether the structure is also a dune under that definition, it is a fence. Therefore, contrary to the Kassins' suggestion, the DEP's exercise of its authority over dune creation is not determinative of the question before us. By choosing to erect a fence that has elements of a dune, whether in an attempt to avoid the local restrictions on fence height or for some other reason, the Kassins have merely subjected themselves to an additional set of state regulations. In reaching our conclusion that the berm is a fence, we do not construe that word either narrowly or broadly, but interpret it consistent with the general understanding of the word. Accordingly, this fence, even if it is a dune, is subject to the requirements of the restrictive covenant and zoning ordinance.

## IV.

### A.

Having determined that this berm is a fence, we now must consider whether the fence violates the 1887 restrictive covenant. In construing such covenants, our primary objective "is to determine the intent of the parties to the agreement." *Lakes, supra,* 810 *P.*2d at 28 (construing "fence" pursuant to spite fence statute). "Generally, in the context of restrictive covenants, a rule of strict construction should be applied...." *Homann v. Torchinsky,* 296 *N.J.Super.* 326, 335, 686 *A.*2d 1226 (App.Div.1997) (citations omitted). However, that canon of construction has its limitations. Importantly, as one court has said in finding that a row of trees could constitute a fence notwithstanding the strict construction rule, "it is well settled that a covenant should not be read in such a way that defeats the *plain and obvious meaning of the restriction." Lakes, supra,* 810 *P.*2d at 29 (emphasis added); *Homann, supra,* 296 *N.J.Super.* at 335, 686 *A.*2d 1226. That is why, "[a]bsent explicit indication of a special meaning, words must be given their ordinary meaning." *Homann, supra,* 296 *N.J.Super.* at 336, 686 *A.*2d 1226 (internal quotation marks and citations omitted).

## B.

■ As noted, the record does not reveal evidence of the precise intent of the drafters when they incorporated a height restriction into the covenant in 1887. But common sense suggests that the drafters most likely intended and expected that such a limitation would enable nearby residents and passers-by to view both the seascape and the landscape of the beach. Our conclusion is reinforced by the later-created ordinance which, in describing the beach zone, recognizes the value of the area's "unique beauty" and "recreational assets." It would be unreasonable to conclude that the drafters intended to prohibit six-foot fences but would allow construction of a fourteen-foot high barrier extending along the westerly boundary of the beach property.

Bubis, moreover, relied on the covenant when she and her late husband purchased the property in 1978. For over a quarter of a century she has enjoyed her property and the benefits of the covenant. She now faces an obstruction that runs counter to both her reasonable reliance and the likely intent of the drafters who created the covenant.

We have carefully considered the ordinary meaning of the word "fence," the probable intent of the drafters, the reliance by Bubis, and the case law. Regardless of what we call it, whether a berm, fence, wall, barrier, or partition, we conclude that this structure, which is at least fourteen feet high, violates the covenant:[1]

## V.

Quite apart form the violation of the covenant, there is a separate question presented—whether the Kassins' fence violates

---

[1] The dissent points out that the 1887 restrictive covenant permitted the construction of a large hotel on the site and, further, that sand dunes were present on the property at the time. But that hotel was never constructed and we cannot know where on the site it would have been placed. Moreover, the record does not reflect the extent and nature of any dunes that might have existed there in the nineteenth century. What we do know is that, today, the Kassins maintain an illegal fence on their property.

Loch Arbour's Zoning Ordinance, and if so, whether CAFRA nonetheless preempts it. We hold that the Kassins' fence violates the ordinance and that CAFRA does not preempt the ordinance.

### A.

 In determining whether the fence violates the ordinance, we must adhere to principles of statutory construction. "Where statutory language is clear, courts should give it effect unless it is evident that the Legislature did not intend such meaning." *Rumson Estates, Inc. v. Mayor of Fair Haven,* 177 *N.J.* 338, 354, 828 A.2d 317 (2003). Moreover, statutory provisions "should be given their literal significance[ ] unless it is clear from the text and purpose of the statute that such meaning was not intended." *Turner v. First Union Nat'l Bank,* 162 *N.J.* 75, 84, 740 A.2d 1081 (1999).

There is nothing ambiguous about the word "fence" as it is used in the ordinance, and nothing in the record indicates that the drafters intended a special meaning of the term. Indeed, section 300 of the ordinance provides for the opposite, that is, "[a]ny word or term not defined [in the ordinance] shall be used with a meaning of standard usage for the context in which the word is used." Thus, according to the ordinance, and as explained at length in Part III above, this berm satisfies the dictionary and decisional definition of a "fence."

 In arguing that the berm is not a fence under the ordinance, the Kassins rely, in part, on the deposition testimony of George Gustafson, a part-time Loch Arbour zoning ordinance enforcement officer. Notably, it does not appear that the Kassins qualified Gustafson as a zoning or planning expert, in contrast to Bubis's expert who had an extensive background in municipal planning and zoning ordinance drafting. And, because he died before trial, only Gustafson's deposition testimony is available. In any event, when asked, Gustafson defined a fence as "[a] series of posts with something in between it." His definition is not only imprecise and unduly narrow, but it is incorrect in light of

decisional law and common experience. *See, e.g., Lakes, supra,* 61 *Wash.App.* 177, 810 *P.*2d 27 (holding that row of trees constituted fence); *Dowdell, supra,* 847 *A.*2d 827 (same); *Wilson, supra,* 119 *Cal.Rptr.*2d 263 (same). Although a municipality's informal interpretation of an ordinance is entitled to deference, *Fallone Props., L.L.C. v. Bethlehem Tp. Planning Bd.,* 369 *N.J.Super.* 552, 561, 849 *A.*2d 1117 (App.Div.2004), that deference is not limitless. As with other legislative provisions, the meaning of an ordinance's language is a question of law that we review de novo. *In re Distribution of Liquid Assets,* 168 *N.J.* 1, 11, 773 *A.*2d 6 (2001); *DePetro v. Tp. of Wayne Planning Bd.,* 367 *N.J.Super.* 161, 174, 842 *A.*2d 266 (App.Div.2004).

Because the Kassins' structure constitutes a fence, and the zoning ordinance applies to this factual circumstance, the Kassins must comply with its provisions. This fence is approximately fourteen feet tall, and at points may rise to eighteen feet. Inasmuch as it exceeds the height allowance by no less than eight feet, it violates the Loch Arbour Zoning ordinance.[2]

## B.

We are convinced that this berm constitutes a fence as that word is commonly understood and as other courts have defined it. For the sake of completeness, we note that even had we found that the berm was not a fence, it is, at least, a wall or hedge—neither of which are permitted in the beach zone.

A wall is "[a]n erection of stone, brick, or other material, raised to some height, and intended for purposes of privacy, security or inclosure." *Black's Law Dictionary, supra,* at 1581. Similar to the definition of "fence," the definition of "wall" focuses primarily on

---

[2] We note that this fence violates the zoning ordinance in another way. The ordinance provides that "[a]ll fences shall be made from a chain link or similar fencing material." Contrary to the Appellate Division's ruling, this provision does not prevent the Kassins' berm from being considered a fence under the ordinance. Instead, the fence also violates the ordinance because of its composition.

the use or function of the structure as its quintessential character-istic. As discussed above, the Kassins admitted at the deposition that they desired privacy for their property. Moreover, the wall of sand operates as a security measure by deterring trespassers from entering the Kassins' beach property, a concern that the Kassins also expressed at their deposition.

A hedge is "[a] row of closely planted shrubs or low-growing trees forming a fence or boundary." *American Heritage Dictionary, supra*, at 602. In *Dowdell, supra*, the court determined that "a row of western arborvitae trees may constitute a hedge," even though that type of tree "may not be the most optimal species for the creation of a hedge owing to their enormous stature and girth," 847 *A.*2d at 830. Here, record photographs of the beach property illustrate that the various trees and shrubbery situated atop of the sand form a hedge. The Kassins lined the mound of sand with dune grass, tall trees, and lower-growing shrubs in close proximity to one another. Consistent with the dictionary definition of "hedge," these plantings clearly delineate the western boundary of the beach property and separate it from the adjacent public street.

In arguing that the berm is not a hedge, the Kassins again rely on former part-time zoning code enforcement officer Gustafson's deposition testimony. When asked to articulate his understanding of "hedge," he replied, "I don't know. . . . A hedge is something that grows that is trimmed." He explained that if the vegetation is not trimmed, it is not a hedge. Contrary to that belief, neither the dictionary nor case law requires that a hedge be trimmed. As a matter of common knowledge and experience, overgrown hedges are at least as common as the groomed variety.

In sum, unlike the commercial and residential zones of Loch Arbour, the beach zone does not provide for walls or hedges as permitted accessory uses. Indeed, section 419 of the ordinance explicitly states that "[a]ll uses not expressly permitted in this ordinance are prohibited." Accordingly, even if the Kassins' berm

was not a fence subject to the height restriction, the ordinance would prohibit the structure in its entirety as a wall or hedge.

## C.

Finally, we consider the Kassins' preemption argument. State legislation preempts a municipal zoning ordinance when the ordinance "expressly forbids something which is expressly authorized by statute or permits something which a statute expressly proscribes." *Tumino v. Long Beach Tp.*, 319 *N.J.Super.* 514, 520, 725 *A.*2d 1173 (App.Div.1999) (citing *Summer v. Tp. of Teaneck*, 53 *N.J.* 548, 554, 251 *A.*2d 761 (1969)). "Preemption analysis calls for the answer initially to whether the field or subject matter in which the ordinance operates, including its effects, is the same as that in which the State has acted. If not, then preemption is clearly inapplicable." *Overlook Terrace Mgmt. Corp. v. Rent Control Bd. of W. New York*, 71 *N.J.* 451, 461, 366 *A.*2d 321 (1976).

CAFRA and the Loch Arbour Zoning Ordinance do not govern the same field. We discern this from the face of the statute and the ordinance. CAFRA governs dune creation and maintenance; the ordinance makes no mention of dunes at all but discusses fence height and location. Because the ordinance and CAFRA do not attempt to regulate the same activities, they do not conflict. *Cf. Tumino, supra*, 319 *N.J.Super.* at 516, 725 *A.*2d 1173 (holding statute preempted ordinance where both contained detailed regulations as to structure, location, and size of recreational docks).

Moreover, the purposes and subject matters of the statute and ordinance are distinct. The legislative purpose of CAFRA is to "preserve[ ] the most ecologically sensitive and fragile area from inappropriate development and provide[ ] adequate environmental safeguards for the construction of any developments in the coastal area" in a manner that is "in the best long-term, social, economic, aesthetic and recreational interests of all people of the State." *N.J.S.A.* 13:19–2. The ordinance operates on a smaller scale and simply sets forth a general objective for the beach zone in Loch

Arbour: "to preserve the existing natural beach area and dunes which are present in the Village for their unique beauty and recreational assets." Thus, neither the purpose nor the specific provision of the ordinance at issue usurps the DEP's authority over dunes.

We have held that, as a general matter, CAFRA "regulations do not preempt local zoning authority." *Lusardi v. Curtis Point Prop. Owners Ass'n*, 86 *N.J.* 217, 229, 430 *A.*2d 881 (1981). Rather, CAFRA "embod[ies] carefully considered policies for the use of coastal resources that local officials must take into account in zoning shoreline property within their communities." *Ibid.* By limiting fence height to six feet, Loch Arbour acted within the traditional purview of a municipality's zoning power and did not impede the DEP's ability to accomplish its goal of protecting New Jersey's coastline from inappropriate development on a statewide basis.

Finally, a determination that CAFRA preempts this type of municipal zoning regulation would allow beach-front property owners to avoid reasonable restrictions on fence height, to the detriment of their neighbors, by building fences out of sand and trees and calling them dunes. We do not believe that the Legislature intended landowners to circumvent local zoning ordinances that regulate fences by invoking CAFRA, especially when, as in this appeal, the so-called dune does not protect the beach from erosion as dunes generally should.

Because CAFRA and the Loch Arbour zoning ordinance concern different fields and regulate different subject matter, we conclude that "preemption is clearly inapplicable," *Overlook, supra*, 71 *N.J.* at 461, 366 *A.*2d 321, and that the municipal provision at issue in this matter applies to the Kassins' fence.

## VI.

For the reasons discussed above, we hold that this berm is a fence as that word is commonly understood. Because it exceeds six feet in height, it violates both the 1887 restrictive covenant and

the local zoning ordinance. Accordingly, we reverse the Appellate Division and remand to the Superior Court, Chancery Division, to grant relief in compliance with this opinion.

Justice RIVERA–SOTO, dissenting.

This appeal requires that we determine whether a sand dune in the form of a berm lawfully erected by a property owner on beach property constitutes a "fence," either under a restrictive covenant or under a municipal ordinance, both of which restrict, in their respective terms, the height and composition of a "fence." After hearing the witnesses and considering the evidence before him, the Chancery Division judge ruled that the sand berm erected in this case by defendants Jack and Joyce Kassin did not constitute a "fence," and thus denied the application of plaintiffs Sophie Bubis and Alcides Ferreira. The Appellate Division similarly held that defendants' sand berm was not a "fence" and also denied relief to plaintiffs. The majority now holds that both the Chancery Division judge and the Appellate Division were wrong as a matter of law. According to the majority, defendants' sand dune is a "fence," *ante*, 184 *N.J.* 622, 878 *A.*2d at 821, and, although it is subject to the provisions of the Coastal Area Facility Review Act (CAFRA) governing sand dunes, *see N.J.S.A.* 19:9–3; *N.J.A.C.* 7:7E–3.16(a), defendants' sand dune nonetheless is subject to fence restrictions in both a restrictive covenant and a municipal ordinance. *Ante*, 184 *N.J.* 624–25, 626–27, 878 *A.*2d at 822–23, 823–24 (2005).

Because I would affirm the determination of both the Chancery Division judge and the Appellate Division that defendants' sand dune was not a "fence" and that "a vegetated berm, a man-made sand dune topped with trees and shrubbery, along the western portion of defendants' property did not violate a restrictive covenant or a Village of Loch Arbour zoning ordinance limiting fence heights," and because plaintiffs had no right to an unobstructed view across defendants' property, I respectfully dissent.

## I.

With respect to the application of the restrictive covenant discussed by the majority—that "no fence shall ever be erected on said lot nearer the line of said Edgemont Avenue higher than four feet"—the Appellate Division, in an unpublished opinion, held that

> [t]he judge's conclusion that the vegetated berm is not a fence is supported by the record. It is also a commonsense interpretation of the term "fence," in the geographic location and context of the property involved.
>
> As defendants point out, it is significant that the property is a beachfront and at the time the restrictive covenant was executed, the property contained sand dunes. .... Thus, under the factual circumstances which existed at the time the restrictive covenant was adopted, if the drafters had meant to equate fences with sand dunes, we would have expected them to so state. The fact they were not explicit indicates that they did not consider sand dunes to be fences at the time.
>
> Finally, the judge's conservative interpretation of the word "fence" is consistent with the general principle that private restrictions on the use of land are generally disfavored. Restrictive covenants must always be strictly construed.

I would adopt the panel's cogent, reasonable and straightforward analysis in its entirety, noting solely that the majority ignores the fact that, to me, is dispositive in this analysis: the existence of sand dunes at the time the restrictive covenant was adopted.

## II.

On the question whether defendants' sand dune violates the municipal ordinance restricting the height and composition of a "fence," I also concur with the Appellate Division's analysis that "the vegetated berm is a man-made sand dune; it is not a traditional 'fence.' Language from the zoning ordinance supports this interpretation." The panel rejected plaintiffs' strained interpretation of the municipal ordinance thusly:

> plaintiffs' interpretation of the pre-1996 ordinance is unreasonable because it would have the illogical effect of making a man-made sand dune an impermissible use on a beach. It also conflicts with the intent of the drafters, who expressed clearly that the very purpose of the beach zone is "to preserve the existing natural beach area *and dunes* which are present in the Village for their unique beauty and recreational assets." (emphasis added). Therefore, plaintiffs' interpretation must be avoided. *State, Tp. of Pennsauken v. Schad,* 160 *N.J.* 156, 170 [733 *A.*2d 1159] (1999) (municipal ordinance should be interpreted to effectuate legislative intent in light of language used and objects sought to be achieved, and should not be construed in

manner that leads to absurd results). The vegetated berm does not violate the Loch Arbour Land Development Regulations Ordinance.

I am in complete accord with the panel's reasoning and adopt it as my own.

I also agree with the Appellate Division when it held that "[w]e need not address the preemption issue" for the following reasons:

Here, CAFRA preemption was only an alternative basis for the Chancery Division's judgment on the question of whether the vegetated berm was prohibited under the Village zoning ordinance. Moreover, the judge's opinion on CAFRA preemption was theoretical because he concluded that the Village zoning ordinance did not regulate the height of sand dunes.

That reasoning is, to me, dispositive of the question.

## III.

Finally, it is important to recognize precisely what is at issue here. Implicitly, the majority subordinates a beach owner's property rights to the following concept: plaintiffs' purported right to "view[ ] the beach and ocean from [their] home." *Ante,* 184 *N.J.* 617, 878 *A.2d* at 818 (2005). I find that concept unpersuasive, particularly in these circumstances where such "right to view the beach and ocean" was ephemeral, at best.

"[I]n the absence of a restrictive covenant, a property owner has no right to an unobstructed view across a neighbor's property." *Bubis v. Kassin,* 323 *N.J.Super.* 601, 616, 733 *A.2d* 1232 (App.Div. 1999) (citing *Harwood v. Tompkins,* 24 *N.J.L.* 425, 427 (Sup.Ct. 1854)). The very restrictive covenant on which plaintiffs and the majority rely to require the demolition of defendants' sand dune— the deed recorded on September 5, 1887 from Stout and Johnson to Fields—specifically provides, in the clause immediately preceding the restrictive covenant concerning the fence, that the owner of defendants' lands may build a hotel on those premises, but that hotel must accommodate a minimum of 200 guests. If plaintiffs' acquired their property on notice of and subject to the fence restriction—something the majority concedes, *ante* 184 *N.J.* 617, 878 *A.2d* at 818 (2005)—then plaintiffs perforce also acquired their adjacent property on notice of and subject to the deed restriction

concerning the construction of a hotel accommodating not less than 200 guests.[1] Clearly, plaintiffs could not have had any reasonable expectation that the beach and ocean view they enjoyed was a right to be enjoyed in perpetuity; that view was subject to the same restrictive covenant plaintiffs here sued to enforce and which, in my view, defeats, as a matter of simple logic, plaintiffs' claim of an unobstructed view across defendants' property.

## IV.

For the foregoing reasons, I dissent.

Justice WALLACE joins in this opinion.

*For reversal and remandment*—Chief Justice PORITZ, Justices LONG, LaVECCHIA, ZAZZALI, and ALBIN—5.

*For affirmance*—Justices WALLACE and RIVERA-SOTO—2.

---

[1] The majority rejects the import of this part of the restrictive covenant by asserting that the "hotel was never constructed and we cannot know where on the site it would have been placed." *Ante*, 184 *N.J.* at 625 n. 1, 878 *A.*2d at 823 n. 1 (2005). The majority also asserts that "the record does not reflect the extent and nature of any dunes that might have existed there in the nineteenth century." *Ibid.* Although those lapses in the record do not affect the majority's conclusion that "[w]hat we do know is that, today, the Kassins maintain an illegal fence on their property[,]" *ibid.*, I reach the opposite result: because I conclude that defendants' sand dune is not an illegal "fence," those lapses in the record caution against expanding the property rights of an adjoining landowner into dominant rights of what is now subservient property. In the final analysis, the source of those "rights" must lie squarely within the restrictive covenant; here they simply do not and lack of knowledge cannot bridge that chasm.