**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0088-24

PAUL SAVAS,

      Plaintiff-Appellant,

v.

NEW JERSEY AMERICAN
WATER COMPANY, INC.,

      Defendant-Respondent.

_____

          Argued November 19, 2025 – Decided December 15, 2025

          Before Judges Mayer, Vanek and Jacobs.

          On appeal from the Superior Court of New Jersey, Chancery Division, Somerset County, Docket No. C-012023-24.

          Christopher J. Marino argued the cause for appellant (Giordano, Halleran & Ciesla, PC, attorneys; Christopher J. Marino, of counsel and on the briefs; Benjamin S. Weisburg, on the briefs).

          Patrick M. Flynn argued the cause for respondent (Archer & Greiner, PC, attorneys; Christopher R. Gibson, of counsel and on the brief; Patrick M. Flynn, on the brief).

PER CURIAM

Plaintiff Paul Savas appeals from a July 30, 2024 order dismissing his two-count complaint against defendant New Jersey American Water Company, Inc. (NJAW) without prejudice. We affirm.

We recite the facts relevant to the issues on appeal. NJAW plans to demolish an existing water tank on property it owns in Bernardsville, New Jersey (Tank Property). NJAW intends to replace that tank with a newly constructed and significantly larger tank (Proposed Tank).

Savas owns a lot adjacent to NJAW's lot (Savas Property). The Savas Property and the Tank Property were previously part of a single lot owned by Mary Stevens Baird.

In 1953, Baird sold the Tank Property to the Borough of Mendham (Mendham) for one dollar. Baird retained ownership of the lots surrounding the Tank Property, including the lot that became the Savas Property. Because the Tank Property was "landlocked" after the transaction between Baird and Mendham, Baird included a twenty-foot-wide right-of-way easement over the portion of land eventually purchased by Savas.

As part of the sale of the Tank Property, Baird and Mendham signed a written agreement (Indenture) in 1953. The Indenture required the Tank

A-0088-24

Property to be used "for public water utility purposes" and Mendham to "construct, operate and maintain a public water utility" on that property. In the event Mendham or its successors in interest failed to do so, ownership of the Tank Property reverted to Baird or her successors.

Additionally, the Indenture contained covenants imposing various restrictions and obligations. The Indenture's covenants required construction of a water tank and a water main for Mendham's residents. The covenants allowed Baird to connect the water main to existing cottages on her property. The covenants required Mendham to provide 4,000 cubic feet of water per quarter to those cottages at no cost to Baird. Mendham also agreed to allow Baird access to the water main for any new structures that might be built on her property. However, Baird would be required to pay for water service to any new buildings.

Of significance here, the Indenture's eleventh covenant stated Mendham would "not construct any well or pump upon the right of way or tank site without the written consent" of Baird or her "heirs and assigns."

In 1954, Mendham constructed a twenty-one-foot-high, 250,000-gallon water tank on the Tank Property, known as the Fenwick Tank. The Fenwick Tank, which NJAW plans to demolish, currently remains on the Tank Property.

 A-0088-24

According to Savas, the Fenwick Tank is "barely visible" from the Savas Property.

On October 27, 1992, Mendham transferred the Tank Property to NJAW. Since that date, NJAW has operated and maintained the Fenwick Tank. In April 2017, Savas purchased a lot adjacent to the Tank Property.

In or around 2020, NJAW determined the Fenwick Tank needed to be replaced with a larger tank to continue providing sufficient and reliable water service to residents in Mendham and Bernardsville and to comply with regulatory requirements governing public water utilities. See re Petition of N.J. Am. Water Co. for a Determination Concerning Fenwick Water Tank Pursuant to 40:55D-19, No. A-3903-22 (App. Div. Nov. 20, 2024) (slip op. at 2-7). According to Savas, the design plans for the Proposed Tank depicted a roof height of seventy-four feet, an antenna height of eighty-three feet, and the capacity to hold 750,000 gallons of water. The plans included the tank, a retaining wall, a silt fence, and a "dry well with type E inlet." The dry well had a diameter of ten inches and a depth of six feet, with a "minimum of [six inches] of stone (1½" aggregate) at bottom and all sides."

In 2022, NJAW filed a petition with the New Jersey Board of Public Utilities (BPU) seeking a determination that municipal approvals were not

4

required for construction of the Proposed Tank. Id. at 3. The BPU transferred the petition to the Office of Administrative Law and assigned the matter to an Administrative Law Judge (ALJ) for a hearing. Id. at 4. The ALJ allowed Savas to intervene and to contest NJAW's petition. Ibid.

At the conclusion of the hearing, the ALJ granted NJAW's petition. Id. at 10. The ALJ concluded any local zoning or land use ordinances precluding construction of the Proposed Tank were inapplicable. Ibid. The ALJ found the Proposed Tank was reasonably necessary to provide safe and reliable water services to residents; alternatives to construction of the Proposed Tank were considered; the location of the Proposed Tank was reasonable after considering the alternatives; and the Proposed Tank was not adverse to the environment or the public's health and welfare. Id. at 9-10. Savas filed exceptions to the ALJ's initial decision. Id. at 10.

The BPU approved the NJAW's Proposed Tank on July 12, 2023. Ibid. at 4-10. The BPU adopted the ALJ's findings that: (1) the Proposed Tank would not have "any adverse impact on the ambient noise levels or air quality in the neighborhood" or "result in an increase in truck or foot traffic"; (2) NJAW had considered forty-six alternate sites; (3) there was "no evidence" that the Proposed Tank would reduce property values in the community; and (4) NJAW

"considered alternate methods to augment the water supply" before filing its petition. Id. at 8-9. The BPU also adopted the ALJ's finding that the Proposed Tank was "reasonably necessary for the service, convenience, and welfare of the public." Id. at 9-10.

Savas appealed the BPU's decision, arguing NJAW failed to establish it was "reasonably necessary for the water tank to be constructed on the [Tank] [P]roperty," as required by N.J.S.A. 40:55D-19 to bypass Bernardsville's local zoning ordinances which would otherwise prohibit its construction. Id. at 10. We affirmed the BPU's decision to allow construction of the Proposed Tank. Id. at 15-20.

While his appeal of the BPU's decision remained pending, Savas filed a complaint in the Superior Court of New Jersey, Chancery Division, Somerset County, to halt construction of the Proposed Tank. In his complaint, Savas raised issues separate from his arguments challenging the BPU's decision.

Savas's complaint asserted the Indenture prohibited NJAW from constructing "any well or pump" on the Tank Property. According to Savas, NJAW's plans for construction of the Proposed Tank included "a significant dry well" and he did not consent to the construction of "any well." Further, he alleged the restrictive covenants in the Indenture "specifically protect[ed] the

6

Savas Property from both noise nuisances and the construction of any large structures" on the Tank Property. Additionally, he claimed the Indenture does not allow the Tank Property's owner to overburden the easement granted to neighboring property owners.

NJAW moved to dismiss Savas's complaint for failure to state a claim for relief under Rule 4:6-2(e). NJAW argued the Indenture's covenant against construction of "any well" did not apply "because "NJAW's plan . . . [did] not include any well." NJAW claimed "[a] 'well' is a device used to extract water (or another liquid resource) from the ground and bring it to the surface for human use," while the "dry well" depicted in its plans was "a stormwater management tool, used to dispose of surface stormwater runoff (i.e., excess water from heavy rains) by funneling it underground where it infiltrates and disperses into the soil." Because the Indenture's covenant "only refers to 'wells'—not dry wells—and the two are dramatically different in purpose and function," NJAW asserted the Indenture should not be read "expansively" to prohibit the Proposed Tank.

In support of its argument, NJAW relied on several dictionary definitions of the word "well," including the Cambridge Dictionary, the Merriam-Webster Dictionary, and Dictionary.com. According to NJAW, the dictionary definitions

7

denoted a "well" as a hole or shaft bored into the earth to obtain water or other things such as petroleum, natural gas, brine, or sulfur.

On the other hand, NJAW argued a "dry well" is a "stormwater management tool." According to NJAW, the New Jersey Department of Environmental Protection, in its Stormwater Best Management Practices Manual, defines a dry well as "a subsurface storage facility, consisting of either a structural chamber or an excavated vault that is only used to collect and temporarily store stormwater runoff." N.J. Dep't of Env't Prot., New Jersey Stormwater Best Management Practices Manual, ch. 9.2 at 2 (Mar. 2021). Because a "well" and a "dry well" have "opposite purposes and functionality," NJAW asserted Savas could not "take advantage of the happenstance that the word 'well' appears in the phrase 'dry well'" to prevent construction of the Proposed Tank.

Savas opposed the dismissal motion, relying in part of several dictionary definitions to argue the terms "well" and "dry well" are interchangeable. Savas argued that because construction of a larger water storage tank would "require some form of stormwater runoff management in the form of a dry well," the Indenture's "common sense" purpose in prohibiting wells was "to protect the owner of the Savas Property from the construction of any larger structures on

the NJAW Tank Site requiring the installation of any dry wells." Savas further argued he did not consent to the construction of "any well" on the Tank Property as required under the Indenture.

During oral argument on the dismissal motion, the judge asked whether Savas was truly concerned about the well. The judge noted Savas appeared to "care[] about . . . stopping the construction of the new water tank by any means." In response to the judge's question, counsel for Savas replied,

> [A]bsolutely, one hundred percent. My client's primary goal and motivation here is the fact that the—there is an enormously increased size water tower beyond that that's reflected in the filing with the Indenture that's going to be built—or that [NJAW] is trying to build on this property.

Counsel further explained the significant size of the Proposed Tank "impact[ed the Savas P]roperty negatively."

After hearing the parties' arguments and reviewing the written submissions, the judge granted NJAW's motion and dismissed Savas's complaint without prejudice for failure to state a claim under Rule 4:6-2(e). In an accompanying fourteen-page written decision, the judge, citing Bubis v. Kassin, 184 N.J. 612 (2005), found "the functionality or purpose of a well or dry well" was the key consideration in determining whether NJAW's dry well for construction of the Proposed Tank violated the Indenture. In Bubis, the Court

9

considered various dictionary definitions to determine whether a sand berm with planted trees constituted a fence higher than four feet tall which was prohibited under a restrictive covenant. Id. at 616-17.

Guided by the Court's decision in Bubis, the motion judge carefully reviewed the dictionary definitions cited by the parties to determine the functionality or purpose of a "well" versus a "dry well." The judge found the first listed definitions for the word "well" established that "a well draws water or other fluids out of the ground and brings them to the surface." On the other hand, the judge found the first listed definitions for the term "dry well" indicated a structure that "brings water down from the surface." The judge found a dry well collects water and allows it to percolate into the land.

Based on the various dictionary definitions, the judge concluded "a dry well does not fit within 'any well'" for purposes of the Indenture, because a "well" and a "dry well" have "different purpose[s] or function[s]." As the judge explained, "[r]egardless of which dictionary the parties pull off the shelf or internet or which definition they consult, the two terms describe different objects."

Applying the reasoning in Bubis, the judge concluded a dry well and a well have different functions. She explained a "well" is "a fixture that obtains

A-0088-24

or removes water or another liquid from the subterranean surface, and brings it through the ground to above the surface for human use. A dry well does the exact opposite." Because a dry well "brings water into the ground," the judge found "it cannot be considered a 'well,' even in an expansive sense." Further, the judge noted "dry wells existed at the time of the Indenture, but nowhere in the Indenture did it mention a dry well." The judge determined a "dry well" was not contemplated by the Indenture and "cannot serve as a basis to block construction of a larger water tank."

Additionally, the judge commented that Savas's arguments related to the construction of a dry well appeared to be "merely a foothold argument to prevent the construction of a larger water tank." Because the Indenture did not prohibit dry wells on the Tank Property, the judge concluded the complaint failed to state a claim and dismissed Savas's complaint without prejudice.

Moreover, the judge addressed Savas's allegation that the Proposed Tank would result in increased usage of the right-of-way resulting in an overburdening of the easement. In addressing the allegation regarding an overburdening of the easement, the judge stated the Indenture "permits NJAW to use the right of way as a means of ingress and egress for construction" and "does not prohibit the activities described" in the complaint. Further, the judge

11

found the complaint failed to "explain[] how construction that creates noise overburdens the right of way and violates the Indenture." However, nothing in the judge's July 30, 2024 order addressed the overburdening of the easement. Rather, the order merely granted NJAW's motion and dismissed Savas's complaint without prejudice.

On appeal, Savas argues the judge erred by finding that the dry well for the Proposed Tank was not a "well" under the Indenture. He further argues the judge's decision regarding the overburdening of the easement denied him due process and an opportunity to be heard. We reject these arguments.

We first address Savas's argument that the judge erred in dismissing his complaint without prejudice under Rule 4:6-2(e). Rule 4:6-2(e) permits a defendant to seek dismissal of a complaint for "failure to state a claim upon which relief can be granted." A motion judge's inquiry on a dismissal motion under this rule is "limited to examining the legal sufficiency of the facts alleged on the face of the complaint" to determine "whether a cause of action is 'suggested' by" those facts. Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989). The judge should search the complaint "in depth and with liberality to ascertain whether the fundament of a cause of action may be

gleaned even from an obscure statement of claim." Di Cristofaro v. Laurel Grove Mem'l Park, 43 N.J. Super. 244, 252 (App. Div. 1957).

In opposing a Rule 4:6-2(e) motion, a plaintiff need only demonstrate the complaint contains "allegations, which, if proven, would constitute a valid cause of action." Leon v. Rite Aid Corp., 340 N.J. Super. 462, 472 (App. Div. 2001). The motion judge must accept "the allegations of the pleading are true" and afford the plaintiff "all reasonable factual inferences." Seidenberg v. Summit Bank, 348 N.J. Super. 243, 249-50 (App. Div. 2002).

A motion judge must examine the allegations in the plaintiff's complaint in a manner that is "at once painstaking and undertaken with a generous and hospitable approach." Printing Mart, 116 N.J. at 746. Because Rule 4:6-2(e) motions to dismiss are "usually brought at the earliest stages of litigation, they should be granted in 'only the rarest instances.'" Lieberman v. Port Auth. of N.Y. & N.J., 132 N.J. 76, 79 (1993) (quoting Printing Mart, 116 N.J. at 772). Nevertheless, dismissal is "mandated where the factual allegations are palpably insufficient to support a claim upon which relief can be granted," Rieder v. State, 221 N.J. Super. 547, 552 (App. Div. 1987), or if "discovery will not give rise to such a claim." Dimitrakopoulos v. Borrus, Goldin, Foley, Vignuolo, Hyman & Stahl, P.C., 237 N.J. 91, 107 (2019).

A-0088-24

We review a motion judge's decision on a Rule 4:6-2(e) motion de novo. Dimitrakopoulos, 237 N.J. at 108. We also accept the facts alleged in the complaint "only for the purpose of reviewing the motion to dismiss" and "pass no judgment on the truth of the facts alleged." Banco Popular N. Am. v. Gandi, 184 N.J. 161, 166 (2005).

Savas argues the judge erred in finding the dry well included in NJAW's design plans for the Proposed Tank did not fall under the Indenture's preclusion against construction of "any well" on the Tank Property. He contends the judge "focus[ed] narrowly on a limited number of entries in certain dictionary definitions for the word 'well,'" and should have consider broader definitions of the term "well" which include the use of a dry well for drainage purposes. Savas also contends the word "any" preceding "well" in the Indenture must be read expansively such that the term "well" includes any "hole[] or pit[]" that "involves the collection of water or another resource." In support of his argument, Savas relies on federal and out-of-state regulations defining a "dry well" as "a well."

"The interpretation of a contract is subject to de novo review by an appellate court." Kieffer v. Best Buy, 205 N.J. 213, 222 (2011). In interpreting a contract, the judge must "determine the intent of the parties." Id. at 223.

A-0088-24

"[U]nless specialized language is used peculiar to a particular trade, profession, or industry," terms in a contract should be given "their plain and ordinary meaning." Ibid. In determining the meaning of contract terms, the judge "should examine the document as a whole and . . . 'should not torture the language of [a contract] to create ambiguity.'" Schor v. FMS Fin. Corp., 357 N.J. Super. 185, 191 (App. Div. 2002) (quoting Nester v. O'Donnell, 301 N.J. Super. 198, 210 (App. Div. 1997)). "Nor may the courts remake a contract better than the parties 'themselves have seen fit to enter into, or alter it for the benefit of one party to the detriment of the other.'" Homann v. Torchinsky, 296 N.J. Super. 326, 336 (App. Div. 1997) (quoting James v. Fed. Ins. Co., 5 N.J. 21, 24 (1950)).

"A restrictive covenant is a contract." Weinstein v. Swartz, 3 N.J. 80, 86 (1949). However, such covenants are not favored under New Jersey law, because they "impair alienability," Berger v. State, 71 N.J. 206, 215 (1976), and "affect the use and enjoyment of the land." Highland Lakes Country Club & Cmty. Ass'n v. Franzino, 186 N.J. 99, 112 (2006). Thus, "covenant language must be construed strictly." Ibid.

While restrictive covenants are interpreted "realistically in the light of the circumstances under which they were created," we have held such covenants

"will not be enforced unless their meaning is clear and free from doubt." Caullett v. Stanley Stilwell & Sons, Inc., 67 N.J. Super. 111, 114-15 (App. Div. 1961). "[T]o qualify as a covenant properly affecting the subject property," the contract term "must define in some measurable and reasonably permanent fashion" the limitations on the uses of that property. Id. at 117. In other words, the "courts will not aid one person to restrict another in the use of his land unless the right to restrict is made manifest and clear in the restrictive covenant." Bruno v. Hanna, 63 N.J. Super. 282, 285 (App. Div. 1960).

We reject Savas's argument that the Indenture's covenant against wells should be interpreted expansively to include NJAW's dry well simply because the Indenture contains the word "any" preceding the word "well." In general, "any" in a contract is understood to mean "all or every." Atlantic Cas. Ins. Co. v. Interstate Ins. Co., 28 N.J. Super. 81, 91 (App. Div. 1953). However, while the word "any" may be said to "allow[] for no exception," this breadth applies "only with regard to those types of things thereafter mentioned." Isetts v. Borough of Roseland, 364 N.J. Super. 247, 256 (App. Div. 2003). Because restrictive covenants must be construed strictly, the prohibition on "any well" should only apply to types of things that are "manifest[ly] and clear[ly]" "wells,"

A-0088-24

Bruno, 63 N.J. Super. at 285, according to the "ordinary understanding" of that word, Bubis, 184 N.J. at 621.

Savas cites federal and out-of-state regulations to determine the plain and ordinary meaning of the term "well" in the Indenture. We decline to consider federal and out-of-state regulations defining "well." First, the federal regulation cited by Savas, 40 C.F.R. § 144.3, was promulgated three decades after the Indenture was recorded. Second, while some states adopted the language of this federal regulation in their own environmental regulations, these out-of-state regulations fail to establish that a dry well is a "well" within the context of the Indenture. Moreover, nothing in New Jersey's regulations define a "dry well" as a "well."

Here, the judge reviewed the first listed dictionary definitions cited by the parties as "guideposts," Bubis, 184 N.J. at 621, to determine the meaning of the term "well" under the Indenture. We discern no error in the judge's consideration of the first listed dictionary definitions, rather than the lower listed dictionary definitions, to conclude a "well" is commonly a structure used to obtain water or other liquids from the ground. Each of the cited dictionaries first define the term "well" as referring to water drawn from the earth. In construing the Indenture, the judge properly considered as controlling the

17

"ordinary understanding" of the words therein, ibid., rather than esoteric and specialized meanings under the less common dictionary definitions.  The judge expressly read the Indenture's restrictive covenant to harmonize the parties' intentions at the time of the Indenture.  See id. at 625.  Additionally, the judge's conclusion regarding the definition of a "well" under the Indenture as not including the term "dry well" imposed the least restrictions on the use, enjoyment, and alienability of the Tank Property.

Because we are satisfied the motion judge properly dismissed Savas's complaint without prejudice, we need not exercise original jurisdiction.

We next consider Savas's argument that he was denied due process as a result of the judge's finding the construction of the Proposed Tank would not overburden the easement.  We review orders on appeal rather than statements of reasons.  See Do-Wop Corp. v. City of Rahway, 168 N.J. 191, 199 (2001).  Nothing in the July 30, 2024 order addressed overburdening of the easement.  Additionally, because NJAW had not begun construction when Savas filed his complaint, any claim the Proposed Tank overburdened the easement was premature and speculative.  Thus, there was no viable claim regarding an overburdening of the easement at the time of the dismissal motion.

A-0088-24

On this record, the judge's dismissal of the complaint without prejudice would permit Savas to assert this claim when it ripens—namely, after NJAW's construction of the Proposed Tank. We express no opinion regarding any future claims of overburdening of the easement based on NJAW's activities related to the construction of the Proposed Tank.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Hawley*

Clerk of the Appellate Division

A-0088-24